Bobby Lewis SHAW, Appellant,

v.

Paul DELO, Superintendent, Missouri State Correctional Facility at Potosi, and Attorney General of the State of Missouri, Appellees.

No. 91–1909.

United States Court of Appeals,
Eighth Circuit.

Submitted June 11, 1991.

Decided Aug. 4, 1992.

Rehearing and Rehearing En Banc Denied;
Stay of Execution Denied Sept. 28, 1992.

Donald L. Wolff, Clayton, Mo., argued, for appellant.

Stephen D. Hawke, Jefferson City, Mo., argued, for appellees.

Before FAGG, Circuit Judge, HENLEY, Senior Circuit Judge, and BEAM, Circuit Judge.

FAGG, Circuit Judge.

Bobby Lewis Shaw, a Missouri death row prisoner, appeals the district court's dismissal of his second petition for a writ of habeas corpus. We affirm.

## I.

While Shaw was incarcerated in Missouri in July 1979, he killed Walter Farrow, a prison corrections officer. The evidence presented at Shaw's trial shows Shaw calmly and deliberately killed Farrow in the course of carrying out a plan to kill Clint Wyrick, the warden's uncle and a prison commissary employee, for payment.

Before the murder, inmate Byron Berry overheard Shaw's discussion with a fellow inmate. The fellow inmate asked Shaw, "When are you going to do that?" Shaw responded, "I'm going—might as well do it, now." Shaw or his fellow inmate mentioned a ring as payment and the name "Clint." Shortly after this conversation, Shaw entered the prison's vegetable preparation room where he worked.

Following normal prison procedure, Officer Farrow had checked out two butcher knives and fifteen paring knives from the prison's cold storage area. The inmates Farrow supervised used the knives to prepare fresh vegetables. Shaw removed the two butcher knives from an unlocked cabinet where Farrow had placed them and stabbed Farrow in the chest, inflicting a wound seven inches deep. With knives in hand, Shaw ran out of the room and down the hall to the prison commissary where Wyrick worked.

Wyrick was sitting at his desk when Shaw entered the room. Shaw moved quickly around Wyrick's desk and began stabbing at Wyrick's chest with both butcher knives. Wyrick fended off many of Shaw's blows with his right arm, but Shaw was able to stab Wyrick once in the chest and twice in the stomach. After stabbing Wyrick for at least thirty seconds, Shaw ran out of the commissary.

A guard heard of the stabbing and ran outside to seal off the area. As the guard attempted to close a gate, Shaw approached and told the guard to get out of his way. When the guard refused, Shaw pulled the two butcher knives from his waistband and moved towards the guard. The guard retreated and Shaw went through the gate. After the guard shouted to another guard to close the next gate in Shaw's path, Shaw ran through that gate. Shaw stopped and surrendered, however, when he heard the guard order a tower guard to shoot Shaw if he continued to run. Walter Farrow died from the wound Shaw inflicted.

## II.

A jury convicted Shaw of capital murder and recommended the death penalty. The Missouri Supreme Court affirmed Shaw's conviction and sentence on direct appeal. *State v. Shaw*, 636 S.W.2d 667, 669 (Mo.) (en banc), *cert. denied*, 459 U.S. 928, 103 S.Ct. 239, 74 L.Ed.2d 188 (1982). Later, Shaw unsuccessfully sought postconviction relief in state court. *Shaw v. State*, 686 S.W.2d 513, 514 (Mo.Ct.App.1985). Shaw filed his first federal habeas petition in 1985. The district court denied Shaw's first petition in 1988 and we affirmed. *Shaw v. Armontrout*, 900 F.2d 123, 124 (8th Cir.1990).

After the denial of Shaw's first habeas petition, Shaw's second habeas attorney obtained previously unutilized prison records concerning Shaw. Shaw focuses on a prison medical record showing he was hospitalized for psychiatric observation for ten days in February 1978 based on a report that he hallucinated hearing voices one night. The prison records also contain a report by investigating officers stating another inmate asked Shaw to kill Wyrick for a diamond ring, school records documenting Shaw's low intelligence quotient, and family information. Shaw's second habeas attorney also obtained an affidavit from Shaw's mother and sister reporting Shaw's odd behavior beginning in his childhood. Relying primarily on this information, Shaw filed his second federal habeas petition in 1990, raising four exhausted claims: (1) he received ineffective assistance of trial counsel because counsel failed to investigate and present evidence of Shaw's diminished mental capacity during the guilt and penalty phases of Shaw's trial; (2) he received ineffective psychiatric assistance at trial because the psychiatrist was not furnished with the prison records; (3) the jury should have been instructed on Shaw's diminished

mental capacity during the penalty phase of his trial; and (4) contrary to *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the penalty-phase jury instructions told the jury they could not consider a mitigating circumstance unless all twelve jurors found the mitigating circumstance existed. Shaw also claims he is incompetent to be executed. Without addressing the merits of Shaw's claims, the district court dismissed Shaw's petition.

## III.

■ After a state prisoner's first federal habeas petition has been decided, federal courts generally cannot consider the merits of claims raised in the prisoner's later federal habeas petitions. Federal courts must usually dismiss claims raised in later habeas petitions as successive or abusive. *See* 28 U.S.C. §§ 2244, 2254 rule 9(b) (1988). Repetitive claims that have been "raised and decided adversely on the merits in an earlier petition" are successive. *Olds v. Armontrout,* 919 F.2d 1331, 1332 (8th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1692, 114 L.Ed.2d 86 (1991); *see also Sanders v. United States,* 373 U.S. 1, 15–17, 83 S.Ct. 1068, 1077–1078, 10 L.Ed.2d 148 (1963). New claims that were not raised in an earlier petition are potentially abusive. *McCleskey v. Zant,* —— U.S. ——, ——, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991); *Olds,* 919 F.2d at 1332. If a petitioner shows cause and prejudice, however, the district court may consider the claims' merits. *Sawyer v. Whitley,* —— U.S. ——, ——, 112 S.Ct. 2514, 2518, 120 L.Ed.2d 269 (1992); *McCleskey,* —— U.S. at ——, 111 S.Ct. at 1470.

■ The cause requirement focuses on the petitioner's conduct. *McCleskey,* —— U.S. at ——, 111 S.Ct. at 1472. The requirement "is based on the principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." *Id.* "If what [the] petitioner knows or could discover upon reasonable investigation supports a claim for relief in a federal habeas petition, what [the petitioner] does

not know is irrelevant." *Id.* Thus, to establish cause, the petitioner must show some external impediment, such as governmental interference or the reasonable unavailability of a claim's factual basis, "'*preventing* counsel from constructing or raising a claim.'" *Id.* (quoting *Murray v. Carrier,* 477 U.S. 478, 492, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986)).

### A.

■ Shaw concedes he raised his ineffective assistance of trial counsel claim in his first petition. Because the first habeas court decided this claim on the merits, *see Howard v. Lewis,* 905 F.2d 1318, 1322–23 (9th Cir.1990) (decision that a claim is procedurally barred is on the merits), we agree with the district court that this claim is successive. Nevertheless, Shaw asserts "it was 'impracticable' for this claim to have been raised as forcibly as it should have been" in the first habeas petition because Shaw's first habeas attorney was unaware of the prison records. (Appellant's Br. at 25.) Thus, Shaw's first habeas attorney did not assert that trial counsel failed to discover the records and present them as mitigating evidence. Although Shaw concedes the records existed at the time of trial, Shaw essentially asserts that his first habeas attorney's failure to discover the records is cause for consideration of the merits of his ineffective assistance of trial counsel claim. We disagree.

Shaw cannot show cause for not bringing all the evidence supporting his ineffective assistance of counsel claim in his first federal habeas petition. *See Sawyer,* —— U.S. at ——, 112 S.Ct. at 2522. Shaw does not show that governmental interference prevented his first habeas attorney from obtaining the records. Nor does Shaw show that the records were not reasonably available. Given the personal nature of the information about Shaw, the common knowledge that prisons routinely keep records concerning prisoners, and the discovery of the records by Shaw's second habeas attorney, we believe that with reasonable diligence, Shaw's first habeas attorney could have discovered this information. *See Jones v. Whitley,* 938 F.2d 536, 541–42 (5th Cir.), *cert. denied,* —— U.S. ——, 112

S.Ct. 8, 115 L.Ed.2d 1093 (1991). Further, the mere discovery of "new" evidence that strengthens Shaw's ineffective assistance of trial counsel claim raised in his first federal habeas petition is not cause warranting consideration of the claim's merits in this second federal habeas action. *See id.* at 542; *McCleskey,* — U.S. at —, 111 S.Ct. at 1472. Finally, the simple failure of Shaw's first habeas counsel to discover the records cannot constitute cause because Shaw had no constitutional right to counsel in the first habeas proceeding. *Harris v. Vasquez,* 949 F.2d 1497, 1513–14 (9th Cir. 1990), *cert. denied,* — U.S. —, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992); *see McCleskey,* — U.S. at —, 111 S.Ct. at 1470 ("[a]ttorney error short of [constitutionally] ineffective assistance ... does not constitute cause"); *see also Coleman v. Thompson,* — U.S. —, —, 111 S.Ct. 2546, 2566–68, 115 L.Ed.2d 640 (1991) (identifying attorney error constituting cause).

### B.

▆ Shaw concedes he raised his second, third, and fourth claims in state court then omitted them from his first habeas petition. Nevertheless, Shaw asserts his first habeas attorney did not know of the supporting facts or law and this lack of knowledge establishes cause. Again, we disagree.

The factual and legal bases for Shaw's three omitted claims were known or reasonably discoverable by Shaw when he filed his first federal habeas petition. Shaw's ineffective assistance of a psychiatrist claim is based on the theory that if Shaw's court-appointed psychiatrist had been provided with the prison records, the psychiatrist would have discovered and testified about Shaw's diminished capacity. The case Shaw relies on to support this claim, *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), was decided before Shaw brought his first petition. Shaw's trial psychiatrist already knew about Shaw's low intelligence and suggestibility, and Shaw admits his prison records existed. Although Shaw contends the prosecution failed to provide the prison records, Shaw does not show officials prevented his psychiatrist or first habeas attorney from discovering the records or that the records were not reasonably available. *See McCleskey,* — U.S. at —, 111 S.Ct. at 1472.

Next, Shaw raised his diminished capacity instruction claim on direct appeal, *State v. Shaw,* 636 S.W.2d at 673, and thus can hardly contend the factual and legal bases for this claim were unknown to him or his attorney later when his first federal habeas petition was filed. *See Antone v. Dugger,* 465 U.S. 200, 206, 104 S.Ct. 962, 964, 79 L.Ed.2d 147 (1984) (per curiam); *Olds,* 919 F.2d at 1332. The fact that the prison records might support this claim does not excuse the claim's omission from the first habeas petition. *McCleskey,* — U.S. at —, 111 S.Ct. at 1472. Finally, the legal basis for Shaw's *Mills* claim was available well before Shaw brought his first petition. *See Gilmore v. Delo,* 908 F.2d 385, 387 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 20, 111 L.Ed.2d 833 (1990). In sum, no external impediment prevented Shaw from raising the three omitted claims in his first federal habeas petition.

### C.

As a matter of law, Shaw cannot show cause. We thus reject Shaw's contention that he is entitled to an evidentiary hearing on cause. *McCleskey,* — U.S. at —, 111 S.Ct. at 1470.

### IV.

▆ Although Shaw cannot show cause, the district court also has authority to address the merits of Shaw's constitutional claims if Shaw shows a failure to entertain the claims would be a "miscarriage of justice." *Sawyer,* — U.S. at —, 112 S.Ct. at 2518. The miscarriage of justice exception applies when a petitioner is actually innocent of the crime of conviction or the penalty imposed. *See id.* To establish actual innocence in a capital case, the petitioner "must show by clear and convincing evidence that but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law." *Id.* at —, 112 S.Ct. at 2517; *see id.*

at —— n. 11, 112 S.Ct. at 2521 n. 11 (rejecting the Eighth Circuit's more lenient probability standard articulated in *Smith v. Armontrout*, 888 F.2d 530, 545 (8th Cir. 1989)); *McCoy v. Lockhart*, 969 F.2d 649, 651–52 (8th Cir.1992) (explaining *Sawyer*'s change in standard). The petitioner can satisfy this standard by showing innocence of the crime itself, by showing no aggravating circumstance existed, or by showing some other condition of eligibility was not met. *Sawyer*, —— U.S. at ——, 112 S.Ct. at 2522. Additional mitigating evidence does not satisfy the standard. *Id.*

■ Under Missouri law, Shaw was eligible for the death penalty because the jury convicted him of capital murder—deliberate and premeditated killing—and found at least one statutory aggravating circumstance. Mo.Rev.Stat. §§ 565.001, .008.1, .012.5 (1978). Shaw asserts he is innocent of capital murder because the jury would have found he did not possess the necessary ability to deliberate or premeditate if it had considered the prison records and family history undiscovered due to his trial attorney's ineffective assistance and an expert opinion based on that information. To support his assertion, Shaw presented the recent affidavit of the court-appointed psychiatrist who testified at Shaw's trial and the opinion of a psychologist who recently examined Shaw to determine his competence to be executed.

At trial, Shaw's court-appointed psychiatrist testified that Shaw is borderline mentally retarded and susceptible to suggestion because of his low intelligence, but capable of resisting suggestion and forming the intent necessary to commit capital murder. After recently learning the facts contained in the prison records, family affidavit, and reports of other mental health experts who have examined Shaw since the trial, the psychiatrist now states that the evidence and reports "cast[ ] significant doubt on the reliability and accuracy of [his earlier] opinion that Mr. Shaw did not suffer from a mental disease or defect [when he committed the murder]." The psychiatrist states the additional facts "would have affected [his] diagnosis" of Shaw over

ten years ago and the psychiatrist "now believe[s] [Shaw] was suffering from the onset of early dementia, and possibly early chronic schizophrenia." The psychiatrist, however, states he needs more information to reach an accurate opinion about Shaw's mental condition at the time of the murder. The psychiatrist does not offer an opinion about Shaw's ability to deliberate and premeditate at the time of the murder.

The psychologist who recently examined Shaw also reviewed some of Shaw's prison records and school reports, administered psychological tests, and reviewed reports of psychologists and psychiatrists who examined Shaw years after the murder. Based on his evaluation, the psychologist believes Shaw suffered from brain damage when he committed the murder and command hallucinations probably played a role in Shaw's commission of the murder. The psychologist, however, does not state these problems nullified Shaw's ability to deliberate and premeditate. The psychologist also acknowledges his opinion, rendered more than eleven years after the murder, is speculative.

Given the prosecution's evidence of Shaw's actions on the day of the murder, we believe the jury could still reasonably infer Shaw acted deliberately and with premeditation even if it had considered the prison records, family affidavit, and recent opinions of the two mental experts. The evidence presented at trial showed Shaw planned to kill Wyrick and calmly killed Farrow in the course of obtaining weapons to carry out his plan. No facts surrounding the murder suggest Shaw heard voices, acted under the substantial domination of another person, acted irrationally, or otherwise lacked control of his faculties.

Shaw has simply presented no new evidence connecting his supposed mental deficiencies to the murder. Contrary to Shaw's assertion, the specified prison records, family affidavit, and expert opinions do not show Shaw suffered from a mental disease, hallucinated hearing voices, or was subject to domination at the time of the killing. The records contain no statements by inmates or prison personnel stating Shaw was acting irrationally or bizarrely

near the date of the murder. The psychologist's opinion that Shaw hallucinated at the time of the murder is purely speculative. Further, the psychiatrist's equivocal affidavit stating he would have testified differently about Shaw's mental capacity if he had known the information contained in the records falls far short of showing Shaw lacked the ability to deliberate or premeditate at the time of the murder. *See Romero v. Collins*, 961 F.2d 1181, 1184 (5th Cir.1992) (rejecting actual innocence claim based on recent affidavits of two trial psychiatrists stating they would have reached a different opinion regarding the petitioner's mental capacity had they known of certain newly discovered medical records); *Harris*, 949 F.2d at 1515–16 (rejecting actual innocence claim based on new psychological evaluations presented thirteen years after the crime stating the petitioner could not form the required intent at the time of the murder). The mere fact that Shaw agreed to kill Wyrick for a ring does not show Shaw was acting under the substantial domination of another person when he killed Officer Farrow. And the affidavit of Shaw's mother and sister reporting Shaw's odd behavior at home does not show Shaw lacked the mental capacity to commit capital murder years later. Without some facts linking Shaw's mental problems to the murder, the prison records, family affidavit, and expert opinions fail to show Shaw did not commit the murder deliberately or without premeditation. Thus, we cannot conclude a reasonable juror would not have found Shaw guilty of capital murder.

■ Alternatively, Shaw contends he is innocent of the death penalty because the jury probably would have recommended life imprisonment instead of death if the prison records, family history, and an expert opinion based on them had been admitted during the penalty phase of his trial. Shaw contends that if this evidence had been admitted, he would have received statutory mitigating instructions. *See* Mo.Rev. Stat. § 565.012.3(2), (5), (6) (1978). Shaw also contends that he would have been sentenced to life rather than death if the trial court had instructed the jury that it could consider a mitigating circumstance even if the jurors did not unanimously agree the circumstance existed.

Shaw's contentions do not affect his eligibility for the death penalty because they relate to mitigating rather than aggravating factors. *Sawyer*, —— U.S. at ——, 112 S.Ct. at 2522. In recommending death the jury found two statutory aggravating circumstances: capital murder of a corrections employee performing an official duty, Mo.Rev.Stat. § 565.012.2(8) (1978), and capital murder by a lawfully imprisoned person, *id.* § 565.012.2(9). Even if the "new" evidence had been admitted and the jury had been instructed on statutory mitigating circumstances, a reasonable juror could still find the aggravating factors making Shaw eligible for the death penalty. *See Sawyer*, —— U.S. at ——, 112 S.Ct. at 2524. Thus, Shaw has not established he is ineligible for the death penalty. *Id.*

In sum, Shaw has not satisfied his high burden to show "clear and convincing evidence that but for a constitutional error, no reasonable juror would have found [him] eligible for the death penalty under [Missouri] law." *Id.* at ——, 112 S.Ct. at 2517. Thus, Shaw has failed to show the refusal to consider the merits of his successive and abusive claims would result in a fundamental miscarriage of justice, and the district court did not abuse its discretion in dismissing these claims without conducting an evidentiary hearing on the claims' merits, *Cornman v. Armontrout*, 959 F.2d 727, 729 (8th Cir.1992).

### V.

■ The district court dismissed Shaw's incompetence claim as successive because Shaw claimed he was incompetent to be executed in his first federal habeas petition and the earlier habeas court denied this claim on the merits. *Shaw v. Armontrout*, 900 F.2d at 124. We believe Shaw asserts a new and different claim in this petition, however. Although Shaw attacks the earlier habeas court's decision that he was competent to be executed, the thrust of Shaw's claim is his current incompetence to be executed. Because Shaw can still bring this claim in state court, *see* Mo.Rev.Stat.

§ 552.060 (Supp.1991); *Shaw v. State,* 686 S.W.2d at 515; *Howard,* 905 F.2d at 1332, the exhaustion doctrine prevents us from considering the claim before the state court has an opportunity to address it. *McCartney v. Vitek,* 902 F.2d 616, 617 (8th Cir. 1990) (per curiam). Missouri decided Shaw was competent to be executed in 1987. Thus, Missouri "may properly presume [Shaw] remains sane ... and may require a substantial threshold showing of insanity merely to trigger the hearing process." *Ford v. Wainwright,* 477 U.S. 399, 426, 106 S.Ct. 2595, 2610, 91 L.Ed.2d 335 (1986) (Powell, J., concurring). This decision, however, belongs to Missouri. We conclude the district court should have dismissed this claim for failure to exhaust the state remedy. Because the merits of Shaw's incompetence claim were not properly before the district court, we also conclude the district court correctly denied Shaw's motion for funds for investigative and expert services to determine his competence to be executed.

### VI.

Having considered all of Shaw's arguments, we affirm the district court's dismissal of Shaw's second federal habeas petition.